ORIGINAL

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

SEP 15 2006

Stephan Harris, Clerk
Cheyenne

PETER D. KEISLER
Assistant Attorney General
MATTHEW H. MEAD
United States Attorney
CAROL A. STATKUS
Assistant United States Attorney
SANDRA M. SCHRAIBMAN (DC Bar 188599)
Assistant Branch Director
ALEXANDER K. HAAS (CA Bar 220932)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Br.
20 Massachusetts Ave., NW, Ste. 7328
Washington, DC 20530
Tel. 202-307-3937  Fax. 202-616-8470
alexander.haas@usdoj.gov
Counsel for Defendants

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, *ex rel.*, Patrick J. Crank, Wyoming Attorney General;<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES; Bureau of Alcohol, Tobacco, Firearms, & Explosives; Carl J. Truscott, in his official capacity as Direct of Bureau of Alcohol, Tobacco, Firearms, & Explosives and David H. Chipman, in his official capacity as the Chief, Firearms Division, Bureau of Alcohol, Tobacco, Firearms, & Explosives;<br><br>Defendants. | 06-CV-0111-J |

## RESPONSE BRIEF OF DEFENDANTS

This lawsuit arises from an effort by the State of Wyoming (the "State") to protect its citizens from the effects of a federal statute whereby persons convicted of certain crimes of domestic violence are federally prohibited from purchasing firearms.

## JURISDICTIONAL STATEMENT

The State challenges a decision of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to no longer accept certain permits issued by the State ("CCW permits") for its citizens as an alternative to the National Instant Criminal Background Check System ("NICS") checks conducted by the Federal Bureau of Investigation.

The State argues that ATF's action is arbitrary and capricious and in excess of ATF's authority and that jurisdiction exists as a federal question, 28 U.S.C. § 1331, and under the Administrative Procedure Act, 5 U.S.C. §§ 702, *et seq*. The State also argues that ATF's action violates the Tenth Amendment. The Court must dismiss this case because the State lacks standing to challenge ATF's action. ATF's action does not injure the State and does not harm Wyoming's sovereign interests. The State lacks standing to bring the claims of its citizens, as *parens patriae*, against the United States. The Court therefore lacks jurisdiction.

## ISSUES PRESENTED FOR REVIEW

Whether the State has established standing to sue the Federal Defendants.

Whether ATF acted arbitrarily and capriciously or in excess of its authority in concluding that CCW permits no longer qualify as an alternative to the NICS system under 18 U.S.C. § 922(t).

Whether ATF's action violated the Tenth Amendment.

1

Defendants submit that the answer to all three questions should be decided in the negative.

## STATEMENT OF THE CASE

ATF has provided the State repeated opportunities over the course of eighteen months to make the choice between complying with federal law or losing federal recognition of CCW permits, thus requiring that applications for firearms transactions be submitted to NICS. The State forced ATF to conclude that revoking recognition of CCW permits was necessary when the State was unwilling to properly apply federal law and recognize that Wyoming residents convicted of misdemeanor crimes of domestic violence ("MCDV") but who had obtained relief under Wyoming statute § 7-13-1501 remained prohibited persons under federal law. The State insists the operation of that Wyoming statute – which is, in label only, an expungement statute – removes these residents' federal firearms prohibition. Due to the State's position, ATF concluded that CCW permits could no longer qualify as an alternative to the NICS check required under federal law because the State would give CCW permits to convicted spousal abusers in violation of law. This lawsuit ensued. The State lacks standing to bring this suit. Further, because ATF's interpretation of the federal firearms law is reasonable and its actions were taken within ATF's authority, ATF did not violate the APA. The State's interpretation of federal law would make federal firearms laws entirely dependent on the label, rather than the substance, of state law procedures. Finally, presenting the State with a choice it did not like is no Tenth Amendment violation. That the State has chosen to deprive its law-abiding citizens of the NICS-alternative system, so that MCDV offenders can obtain firearms and carry them in a concealed manner, is regrettable, but it is the State's choice.

2

STATUTORY BACKGROUND

Section 922(g) of Title 18 of the U.S. Code – the Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 921, *et seq.*, – makes it unlawful for certain categories of people to ship, transport, receive or possess firearms in interstate commerce. Recognizing that "plea bargains [in domestic violence cases] often result in misdemeanor convictions for what are really felony crimes," 142 Cong. Rec. S10379 (daily ed. Sept. 12, 1996) (statement of Sen. Feinstein), Congress established the 922(g)(9) prohibitor as a policy of "zero tolerance when it comes to guns and domestic violence." 142 Cong. Rec. S8831 (daily ed. July 25, 1996) (statement of Sen. Lautenberg). One prohibited category is therefore a person "who has been convicted in any court of a misdemeanor crime of domestic violence . . . ." 18 U.S.C. § 922(g)(9). Congress also provided that:

> [a] person shall not be considered to have been convicted of [a misdemeanor crime of domestic violence] for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921(a)(33)(B)(ii). Significantly, the GCA does not define the term "expungement."

The Brady Act requires that a dealer must contact the database established by the Act before transferring a firearm to an unlicensed person to ensure that person is not prohibited from possessing firearms. 18 U.S.C. § 922(t)(1). Section 922(t)(1) does not apply if the person presents "a permit that . . . was issued not more than 5 years earlier by the State in which the transfer is to take place and . . . the law of the State provides that such a permit is to be issued only after an authorized

3

government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law." *Id.* § 922(t)(3).

Wyoming has a general expungement provision, Wyoming Statute § 7-13-1401(f), that provides, "[a] person who has received an order of expungement under this section may respond to any inquiry as though the arrest, or charge or charges did not occur, unless otherwise provided by law." In 2004, the State passed § 7-13-1501 – at issue in this case – which does not say that the conviction "did not occur." Section 7-13-1501(a) states that the law's purpose is only for "restoring any firearm rights lost." Subsection (k) provides that such expungements "shall *only* be used for the purposes of restoring firearm rights that have been lost to persons convicted of misdemeanors" but that purportedly expunged convictions may be used to "enhance[] penalties for second or subsequent convictions of misdemeanors under the laws of this state."

## STATEMENT OF FACTS

In 2004, ATF began a review of all States utilizing the NICS alternative. After learning of newly enacted § 7-13-1501, however, ATF wrote to the State in July 2005, stating that ATF had reached the legal conclusion that the State's permit no longer met the criteria. *See* Administrative Record ("AR") at Exh. C. ATF explained that § 7-13-1501 does not erase the fact of conviction, which is necessary to qualify as an expungement under federal law. *Id.* Instead, the State would issue CCW permits to persons with MCDV convictions who received what that statute labeled an "expungement," and the State would in fact be issuing CCW permits to persons prohibited from possessing firearms under federal law. *Id.* ATF asked that the State confirm by September 30, 2005,

4

that no CCW permits would issue to persons with MCDV convictions who obtained relief under the statute and offered aid in drafting a true expungement provision. *Id.*

On August 30, 2005, the State responded and disagreed with ATF's legal analysis and asked ATF to withdraw the deadline. *See* AR at Exh. D.  ATF carefully reviewed the legal arguments raised and responded in January 2006, advising the State that ATF still found that CCW permits did not qualify as a NICS alternative permit under 18 U.S.C. § 922(t). *See* AR at Exh. E.  The letter explained that to resolve this issue, the State would need to either:  (1) not issue permits to anyone with relief under § 7-13-1501, or (2) amend § 7-13-1501 to meet the federal standard for expungement. *Id.*  In February 2006, the State asked for an extension to this deadline  stating, for the first time, that the State's legislature could not address this issue until 2007.

In March 2006, ATF responded that at the time of its earlier letters, ATF believed that the State could address this issue legislatively during its February 2006 session. *See* AR at Exh. F.  Only when ATF learned this was inaccurate did ATF agree that this changed the utility of an April 14, 2006 deadline for legislative language. *See id.*  However, ATF explained that an extension to the next legislative session was not a solution because it would allow prohibited persons to receive and possess firearms without a NICS check, since the State would not agree to forebear granting CCW permits to those prohibited persons during the interim. *Id.*  ATF also informed the State that it needed to confirm that CCW permits would not be issued to persons obtaining relief under § 7-13-1501. *Id.*  ATF subsequently agreed to a further one-month extension of the deadline for the State to decide its course of action. *See* AR at Exh. G.  The State filed this lawsuit in May 2006.

5

## SUMMARY OF ARGUMENT

The State has not established an injury to its sovereign interests to establish standing and cannot bring a *parens patriae* claim against the United States. ATF's action was taken in accordance with federal law and under the federal law definition of expungement and was therefore not arbitrary or capricious and not in excess of its authority. The choice that ATF gave to the State so that the State could choose to participate in a federal program did not violate the Tenth Amendment.

## ARGUMENT

### I.      THE COURT LACKS JURISDICTION OVER THE STATE'S SUIT

Article III "confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984). In order to satisfy the case or controversy requirement, every plaintiff in federal court must establish standing to bring his claim. *Winsness v. Yocom*, 433 F.3d 727, 731 (10th Cir. 2006). To establish standing, a plaintiff must generally establish: (1) an "injury in fact," *i.e.*, one which is both "concrete and particularized" and "actual or imminent;" that is (2) "fairly traceable to the challenged action of defendant;" and (3) "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal marks omitted). *See also Winsness*, 433 F.3d at 731. These requirements are not relaxed when a State, like Wyoming, files suit; it, too, must have standing to sue to challenge ATF's decision. *See State of Wyoming, ex rel. Sullivan v. Lujan*, 969 F.2d 877, 881-82 (10th Cir. 1992). Indeed, added standing concerns emerge when a State is a plaintiff. It is "settled doctrine that a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as

6

a volunteer the personal claims of its citizens." *Maryland v. Louisiana*, 451 U.S. 725, 767 (1981). Here, neither the State's sovereign nor quasi-sovereign interests are injured. Indeed, the State suffers no injury through ATF's non-recognition of CCW permits as alternative to the NICS check.

A.    The State's Sovereign Interests Are Not Injured By ATF's Action

A State's sovereign interests include "the exercise of sovereign power over individuals and entities within the relevant jurisdiction – this involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982). The State claims that its "sovereignty and its legitimate state interest in the continued enforceability of its own statutes" is injured. Compl. ¶¶ 36, 37.

However, ATF's action does not prevent the State from creating or enforcing its laws. Wyoming may have whatever law it chooses. However, where federal recognition of State laws is involved, such state laws must meet federal standards in order to provide its citizens an alternative avenue for complying with federal law. ATF's action therefore merely enforces the requirements of federal law, which ATF may do as the administrator of the comprehensive statutory system regulating firearms. *See* 28 C.F.R. § 0.130(a); *accord* 18 U.S.C. § 926(a). To be sure, ATF advised the State that if it wanted its citizens to continue to be able to take advantage of the NICS alternative program, it would need to modify state law. *See* AR at 11, 23. But offering this choice to the State is not tantamount to declaring that the State cannot create or enforce its laws. The State is free to repeal or amend § 7-13-1501 or to take no action. And if § 7-13-1501 remains in effect, nothing prevents the State from issuing CCW permits. But these CCW permits will no longer qualify as a

7

NICS alternative for purposes of *federal* law. *See* AR at Exhs. C & E. There is no injury to the State's sovereignty because ATF's action does not affect its power to create or enforce a legal code, *see Snapp*, 458 U.S. at 601; instead ATF's action affects federal recognition of state laws. But no state is entitled to be a permit state; rather, States may use the NICS alternative only if they comply with federal law, *see* 18 U.S.C. § 922(t)(3), and that is a choice left to each state. Finally, even if these permits no longer qualify as a NICS alternative, Wyoming citizens can still engage in firearms transactions. But they must simply submit to an ordinary NICS check, like non-Wyoming residents.

That the State does not like the choice before it does not translate into an injury to its sovereignty. Indeed, the Supreme Court rejected that view when it held that a State suing on "its own behalf, in effect, complain[ing] that the act in question invades the local concerns of the state, and is a usurpation of power, viz. the power of local self-government, reserved to the states" it is "sufficient to point out that the powers of the state are not invaded, [when] the statute imposes no obligation but simply extends an option which the state is free to accept or reject." *See Massachusetts v. Mellon*, 262 U.S. 447, 480 (1923). The State faced such an option and made its choice. *See* AR at Exhs. D & G. The State is free to reject federal requirements to qualify for the NICS alternative, but it suffers no injury to its sovereignty because it does not like the consequences.

B.    The State Has No Standing, As *Parens Patriae*, Against the United States

It is evident that the State of Wyoming attempts to bring this case "to pursue the interests of [] private part[ies] and pursue those interests only for the sake of the real party in interest," *see* Snapp, 458 U.S. at 602, *i.e.*, its citizens who will now be subject to the NICS check because of

8

Wyoming's decision. Indeed, Wyoming clearly states that it brings this suit in an attempt to avoid "adverse impacts to Wyoming's law-abiding FFL dealers and CCW holders." Compl. ¶54; *see also* ¶ 29. As a "nominal party," with no injury of its own, it is well established that Wyoming may not sue the United States based on such quasi-sovereign interests. *See Snapp*, 458 U.S. at 602, 609 n.16.

While a state's "quasi-sovereign" interests can sometimes be brought in a *parens patriae* action,[1] *see id.* at 600, the Supreme Court has held that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Snapp*, 458 U.S. at 610, n.16. *See also Mellon*, 262 U.S. at 487 ("It cannot be conceded that a state, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof"). The *Snapp* Court reasoned that while "the State, under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government [because] [i]n that field it is the United States, and not the State, which represents them as *parens patriae*." *Snapp*, 458 U.S. at 610, n.16. The Tenth Circuit

---

[1] While not easily definable, quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its populace." *Id.* at 602. *Parens patriae* standing occurs where "the plaintiff state is not merely advancing the rights of individual injured citizens, but has an additional sovereign or quasi-sovereign interest." *Satsky v. Paramount Comm.*, 7 F.3d 1464, 1469 (10th Cir. 1993). A State has "a quasi- sovereign interest in the health and well-being – both physical and economic – of its residents in general." *Snapp*, 458 U.S. at 607. States may sue to protect its citizens against 'the pollution of the air over its territory; or of interstate waters in which the state has rights.'" *Satsky*, 7 F.3d at 1469. But the State's interest in allowing its citizens to avoid the GCA – by allowing persons convicted of an MCDV to possess firearms – is hardly an interest in their citizens' "health and well-being." This is not an appropriate interest to confer *parens patriae* standing, even if such a suit could be brought against the United States. *See Maryland*, 451 U.S. at 767 (noting the "settled doctrine" that a State has no standing where it is "merely litigating as a volunteer the personal claims of its citizens"); *Satsky*, 7 F.3d at 1469.

squarely agreed with that holding in *Lujan*, where the State of Wyoming sued the federal government over the Department of Interior's exchange of federally owned coal for a conservation easement in a national park. *See State of Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877 (10th Cir. 1992). In *Lujan*, the Tenth Circuit affirmed this Court's dismissal of the State's complaint because the State had failed to establish standing. *Id.* at 881-82. Further, the *Lujan* Court "agree[d] that the State does not have standing as a *parens patriae* to bring an action on behalf of its citizens against the federal government because the federal government is presumed to represent the State's citizens." *Id.* at 883. The Court recognized that a "'generalized grievance that the [government] is not acting in a way in which [the State] maintains is in accordance with federal laws . . . is insufficient to demonstrate standing.'"[2] *Id.* (quoting *State of Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990)). Yet the State's core claim here is just that: the State claims, wrongly, that ATF is prohibiting what the State believes is allowed under federal law. *See* Wyoming Brief (Wy Br.) at 10-14.

Thus, if "the state wants to 'protect its citizens from the operation of a [federal] statute,' it has not standing as *parens patriae*." *Puerto Rico Pub. Housing Admin. v. United States Dep't of Housing & Urban Develop.*, 59 F. Supp. 2d 310, 326 (D.P.R. 1999). Wyoming citizens may, if they are injured by ATF's action, challenge ATF's decision to no longer recognize a CCW permit issued to them, but the State itself may not do so on their behalf. The State's desire to advocate for its

---

[2] The other circuit courts have all agreed that States lack standing to sue the federal government in a *parens patriae* capacity, in the manner that the State here alleges. *See Burford*, 918 F.2d at 858; *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989).

10

CCW permit holders is irrelevant for standing. *See Snapp*, 458 U.S. at 602 ("Interests of private parties . . . do not become [sovereign interests] simply by virtue of the State's aiding in their achievement"). The State lacks standing, and this action should therefore be dismissed.

II.    ATF'S ACTION IS NOT ARBITRARY OR CAPRICIOUS OR IN EXCESS OF ITS STATUTORY AUTHORITY

The State's principal claim is that ATF's action in concluding that CCW permits would no longer qualify for the NICS alternative violated the APA. *See* Wyoming Brief (Wy. Br.) at 7-16. However, because relief under § 7-13-1501 is ineffective under federal law in restoring a person's federal firearms rights, ATF did not violate the APA by concluding that CCW permits would no longer qualify for a NICS alternative if they were issued to persons with MCDV convictions who obtained relief under § 7-13-1501. At bottom, this dispute turns on an ATF interpretation of federal law to which this Court must give due deference in considering the meaning of the GCA. On the merits, ATF acted consistently with the GCA in applying a minimum federal standard of what constitutes an "expungement" for purposes of federal law. The State therefore has failed to meet its burden, under the APA, of showing that ATF's action was irrational.

A.    ATF Considered The Relevant Factors, ATF's Action Is Consistent With The APA

Review of ATF's actions under 5 U.S.C. § 706(2)(A) is "narrow, and the agency need only demonstrate that it considered relevant factors and alternatives after a full ventilation of issues and that the choice it made was reasonable based on that consideration." *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1453 (10th Cir. 1994). Thus, a Court "will not substitute its judgment for the agency's, but instead must uphold the agency if there is a rational basis for the decision." *Id.*

11

In determining that § 7-13-1501 did not meet the federal standard for an expungement and thus CCW permits could no longer function as a NICS alternative, ATF considered the relevant factors – state law, federal law (including other undefined provisions of the GCA), the State's desire to remain a permit state, and public safety concerns – and reached a decision consistent with the GCA and its purposes. Although the State alleges otherwise, ATF does not dispute that state law must be considered in determining who is federally prohibited from possessing firearms; state law controls what constitutes an MCDV conviction and by what process the conviction has been exempted. But it is federal law that controls whether possession of a firearm violates a federal statute. To find otherwise would allow states to completely circumvent the GCA by attaching mere labels to state procedures, as the State has done here. This would undermine the uniformity of federal law and effectively void the federal policy of prohibiting those with MCDV convictions from possessing firearms. This was not the intent of Congress. Indeed, Senator Lautenberg, who sponsored the legislation, rejected the notion that state law could be used to avoid the Federal prohibition. *See* 142 Cong. Rec. S11,872, 11,877-78 (daily ed. Sept. 30, 1996) ("But I want to make it clear that the restoration of any firearm rights under state law would not amount to a civil rights restoration for these purposes. In fact, any such State law effectively would be preempted by this language, and so could not have any legal effect.").[3]

---

[3] As the sponsor, Senator Lautenberg's statements regarding the MCDV statute's language as enacted "are an authoritative guide to the statute's construction." *See North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526-27 (1982). Indeed, to reject ATF's interpretation would frustrate Congress' purpose. *United States v. Heckenliable*, 446 F.3d 1048, 1051 (10th Cir. 2006) ("Our interpretation must give practical effect to Congress' intent, rather than frustrate it").

12

In stark contrast to the State's general expungement law, § 7-13-1401, which provides that after expungement under that provision the offense "did not occur," section 7-13-1501 removes an MCDV conviction *only* in an effort to restore lost firearms rights. Moreover, a purportedly expunged MCDV conviction under § 7-13-1501 is *not* considered expunged or set aside for *other state law purposes* because such offenses may still be considered for criminal justice purposes. ATF's rejection of the section as a valid expungement is rational, reasonable and consistent with the GCA. Further, the State's refusal to apply federal law prohibitions when awarding CCW permits provides ample basis to withdraw federal recognition of those permits as an alternative to NICS because a permit is acceptable under 18 U.S.C. § 922(t)(3) if the state does not grant permits "in violation of law." As we now show, ATF properly interpreted federal law and the State's APA challenge must fail.

>1.   Whether An Expungement Restores Federal Rights is a Question of Federal Law

As explained in ATF's policy letters, *see* A.R. at Exhs. C &E, while federal law does not generally take state law into account for its interpretation, Congress drafted the federal firearms laws to take account of state law for some purposes, such as defining what constitutes a conviction or what state action could possibly remove a federal firearms disability. Thus, section 921(a)(33)(B)(ii) of Title 18 provides an exception to disabling MCDV convictions such that:

> A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored . . . unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

13

18 U.S.C. § 921(a)(33)(B)(ii).[4]  Under ATF's interpretation of the GCA, which is entitled to due deference, the law of the jurisdiction (state law) controls (i) what constitutes a felony or a MCDV conviction, and (ii) how the State may exempt some convictions – by pardon, expungement, set aside, or restoration of civil rights.  The courts have generally agreed.  *See, e.g., United States v. Smith*, 171 F.3d 617, 625 (8th Cir. 1999) ("Congress continued to look to state law to define the restoration exception").[5]  While state law therefore has a role in defining conviction, federal law controls whether someone violates the federal firearms laws.  *See United States v. Brailey*, 408 F.3d 609, 612 (9th Cir. 2005) ("*Caron* establishes, however, that while the restoration of civil rights enjoyed under state law by persons convicted of crimes is governed by state law, federal law governs whether a person's possession of a firearm violates a federal statute").

Thus, while Congress has relied upon state law to define what constitutes a "conviction," *see* 18 U.S.C. § 921(a)(20) & (a)(33), it has not done so with regard to defining what constitutes an "expungement" – an undefined term in the GCA.  Thus, the mere fact that a state labels some procedure an "expungement" does not necessarily mean that it is an expungement under federal law. In *Brailey*, for example, the Ninth Circuit held that because defendant's misdemeanor conviction did not remove his core civil rights, his civil rights were not "'restored' within the meaning of federal

---

[4]  This provision is similar to the section 921(a)(20) exception to disabling felony convictions with a notable exception.  Unlike section 921(a)(20), section 921(a)(33) does not refer to "law of the jurisdiction" to determine what is a conviction.  Nevertheless, it has been ATF's longstanding position that the sections should be read coextensively.

[5]  *But see United States v. Cadden,* 98 F.Supp.2d 193, 196 (D.R.I. 2000).

law" by Utah statutes, although a 2000 amendment to Utah law permitted him to possess firearms. *See id.* at 611. "[T]he effect of an expungement . . . now depends on a mixture of state and federal law," *Gill v. Ashcroft*, 335 F.3d 574, 577 (7th Cir. 2003), and "federal law dictates that the convicted felon may not possess any firearms." *United States v. Diaz*, 2005 WL 1278854, at \*3 (D. Or. 2005).

Notably, like the undefined term "expungement," Courts construe other undefined terms in the GCA uniformly under federal law. First, both sections 921(a)(20) and 921(a)(33)(B)(ii) state that a person otherwise convicted either as a felon or for a misdemeanor crime of domestic violence is not convicted if their "civil rights [are] restored." Congress did not define the term "civil rights restored." Nevertheless, federal courts have applied an overarching federal standard that defines what civil rights need to be restored for the removal of the federal firearms disability. *See United States v. Leuschen*, 395 F.3d 155, 159 (3d Cir. 2005). For purposes of federal law the core "'civil rights' encompasse[] the rights to vote, hold public office, and to sit on a jury." *Id.* (citing *United States v. Thomas*, 991 F.2d 206, 211 (5th Cir. 1993); *United States v. Cassidy*, 899 F.2d 543, 549 (6th Cir. 1990)). *See also United States v. Kirchoff*, 387 F.3d 748, 750 n.2 (8th Cir. 2004) (same). If a state does not grant these three rights, it is irrelevant how many other "civil rights" the state may restore, and the federal firearms disability remains. *See United States v. Huff*, 370 F.3d 454, 460-61 (5th Cir. 2004) (stating that although the defendant's right to possess firearms was restored by the state, the right to serve on a jury was not, so he remained federally prohibited from possessing firearms). But if a state grants the core rights but withholds other "civil rights," the disability is lifted, unless firearms restrictions are expressly imposed. Thus, while state law is relevant to see

15

what rights are restored, an uniform federal standard controls whether the restoration of those "civil rights" has relieved the federal firearms disability.

Congress left the term "committed to a mental institution" in 18 U.S.C. § 922(g)(4) undefined. The few courts that have addressed the term "committed to a mental institution" recognize that while the issue may be informed by state law, a uniform federal standard should apply to further the federal policy. *See United States v. Chamberlain*, 159 F.3d 656, 658 (1st Cir. 1998) (whether a "commitment" under GCA, required the Court to take "account whatever guidance state law may offer, [but] our interpretation must in any case be consistent with federal policy"); *United States v. Waters*, 23 F.3d 29, 31 (2d Cir. 1994) (being "committed to a mental institution is a question of federal law, [but] a reviewing court may seek guidance from state law"). Thus, a Court should look to "the substance of [state] procedures," not "the label attached by the state legislature" when interpreting "committed to a mental institution." *Chamberlain*, 159 F.3d at 663.

Thus, an overarching federal standard should be applied to the term "expunge[ment]" as informed by the state law procedures behind the state label. While the State uses the label "expungement," the label should not control; instead the "substance of those procedures" should be examined. Such examination shows that relief under 7-13-1501 is not an "expungement" within the meaning of federal law and would be inconsistent with the goals and purpose of the GCA.[6]

---

[6] *Accord United States v. Frechette*, 456 F.3d 1, 7 (1st Cir. 2006) (evaluating "whether the phrase 'knowingly and intelligently' [found in 18 U.S.C. § 921(a)(33)(B)(i)(II)(bb)] is to be measured by federal or state standards" and finding that a *federal* standard was appropriate).

16

### 2.    What Constitutes an Expungement under Federal Law

While "Congress may, by legislative act, add to or redefine the meaning of any word," where it fails to do so, courts "must presume [Congress] intended to employ the common meaning of the word." *United States v. Singleton*, 165 F.3d 1297, 1300 (10th Cir. 1999) (en banc). Because Congress did not define the term "expungement" in section 921(a)(33)(B)(ii), the Court should therefore examine dictionary definitions of the term to determine the common meaning. *See id.* The common meaning of the term "expunge" refers to an act that erases the fact of a conviction. *See* Webster's Collegiate Dictionary, 10th ed., p. 410 (defining "expunge" as "to strike out, obliterate, or mark for deletion"). *Accord* Black's Law Dictionary, 6th ed., p. 582; *United States v. Johnson*, 941 F.2d 1102, 1111 (10th Cir. 1991) ("The word expunge generally means the physical destruction of information.") (citation omitted). Thus, the State's general expungement law, § 7-13-1401, provides that the expunged offense "did not occur," and would meet the common meaning of the term. But § 7-13-1501, which is solely to restore lost firearms rights and expressly allows purportedly expunged convictions to be used for criminal justice purposes, does not.

In federal sentencing cases, courts regularly distinguish between expungement statutes and those statutes that permit the use of records for certain law enforcement purposes. Under federal sentencing guidelines, expunged convictions are not counted. *See* U.S.S.G. 4A1.2(j) & 4A1.2, Comment, n. 10. Also similar to the GCA, the guidelines do not define the term expungement. In determining whether a conviction is expunged, the Tenth Circuit, for example, has concluded that for federal sentencing purposes "whether a conviction is expunged . . . requires sentencing courts to

17

analyze the true basis for expungement under state law rather than relying on the varied nomenclature among jurisdictions."[7] *See United States v. Hines*, 133 F.3d 1360, 1362-65 (10th Cir. 1998) (finding no expungement under Arkansas law when "[n]otably absent from this listing of the effects of expungement is any limitation of a court's use of the expunged conviction for future sentencing purposes"); *see id.* at 1363 n.4.   Section 7-13-1501 does not provide for absolute expungement such that the conviction did not occur.   Indeed, subsection (k) of 7-13-1501 specifically permits the use of purportedly expunged convictions for "enhancement of penalties for second or subsequent convictions of misdemeanors under the laws of [Wyoming]." Thus, § 7-13-1501 would not be an expungement for purposes of federal sentencing.  Without a clear indication that Congress desired another understanding in the GCA, the same analysis should apply here.

Wyoming law provides for absolute expungements in other statutes such that those convictions are deemed not to have occurred.  Section 7-13-1401, a general expungement law, provides, "[a] person who has received an order of expungement under this section may respond to any inquiry as through the arrest, or charge or charges did not occur, unless otherwise provided by law."  In addition, the State's other statutory sections provide that upon entry of expungement, the proceedings are "deemed never to have occurred and the petitioner may reply accordingly upon any inquiry in the matter." *See* Wyo. Stat. §§ 14-6-440 (expunging records in juvenile court); 14-6-241

---

[7] Other circuits have agreed. *See, e.g., United States v. Townsend*, 408 F.3d 1020, 1023-24 (8th Cir. 2005) (agreeing there was no expungement when calculating criminal history under federal law where the Iowa law was "not absolute"); *United States v. Matthews*, 205 F.3d 544, 548 (2d Cir. 2000) (finding that the "labeling of the effect of the New York youthful offender statute does not govern our interpretation of the [Federal] Guidelines").

18

(expunging records in juvenile and municipal courts).[8]  Section 7-13-1501 stands in stark contrast to other State statutes and does not treat the conviction as having never occurred.  Given that the State could have provided for complete expungements and did not, the "failure . . . to include a matter within a particular statute is an indication that its exclusion was intended." *See Matthews*, 205 F.3d at 547.

Moreover, the State's purpose in enacting § 7-13-1501 was not to erase the fact of conviction but was *solely* to restore firearms rights.  *See* Wyo. Stat. Ann. § 7-13-1501(a) (A misdemeanant "may petition the convicting court for an expungement of the records of conviction for the purposes of restoring any firearm rights lost."); § 7-13-1501(k) ("An expungement granted pursuant to this section shall only be used for the purposes of restoring firearm rights.").  But the mere restoration of firearms rights does not amount to an expungement and does not restore *federal* firearms rights.

Perhaps recognizing this, the State *now* argues that the so-called expungement law is a set-aside.  *See* Wy. Br. at 16-17.  If the Court considers this argument,[9] it should be rejected for similar reasons.  Set-aside is defined to mean "[t]o reverse, vacate, cancel, annul or revoke a judgment,

---

[8]  Thus, a Wyoming Attorney General Opinion interpreting § 14-6-241 stated, "[i]f a record is expunged, it is deemed never to have occurred.  Therefore, it cannot be used as evidence in future cases." 1987 Wyo. Op. Atty. Gen. 1, 1987 WL 341744, at *1 (Feb. 11, 1987).

[9]  The State did not clearly present this argument to ATF in the course of the agency's decisionmaking process and referenced set-asides only obliquely in the context of why § 7-13-1501 was an expungement under federal law.  *See* AR at Exh. D.  A person appealing an agency decision cannot raise new arguments to a Court that were not presented to the agency.  *See Silverton Snowmobile Club v. U.S. Forest Service*, 433 F.3d 772, 783-84 (10th Cir. 2006) (NEPA context).  *Accord Micheli v. Director, OWCP*, 846 F.2d 632, 635 (10th Cir. 1988). This argument should be deemed waived.

19

order, etc." Black's Law Dictionary (6th Ed.) at p. 1372. Thus, when a conviction is set-aside it is rendered without legal effect. *Cf.* 27 C.F.R. § 478.1142 (referring "any expunction, reversal, setting aside of a conviction, or other proceeding *rendering a conviction nugatory*") (emphasis added). But the State procedure does not render convictions without legal effect; it does the exact opposite – the procedure ensures that under state law purportedly expunged convictions can be used in future criminal justice proceedings. The only effect of relief under § 7-13-1501 is to restore lost firearms rights, nothing else. By no stretch of language could this be deemed the setting-aside of a conviction. Indeed, in slightly different circumstances the Supreme Court of Wyoming rejected, under Wyoming law, just such an interpretation of a California law that provided for incomplete expungements. *See Reay v. State of Wyoming*, 800 P.2d 499, 502 (Wyo. 1990) (noting that the "grace extended to the Defendant by the State of California did not . . . extinguish his conviction for all purposes. [It] remains extant for purposes of W.S. 6-8-102 [making it a crime for MCDV offenders to possess firearms]"). This Court should reject the State's set-aside argument as well.

Allowing a state to restore firearms rights without providing for a complete expungement of the conviction would be contrary to the very purpose of the federal MCDV law and would therefore undermine the federal policy. Indeed, the sponsor of the law specifically rejected that state law could merely restore a MCDV offender's right to possess firearms and thereby avoid federal law. *See* 142 Cong. Rec. S11,877-78 (daily ed. Sept. 30, 1996) (Statement of Sen. Lautenberg). Finally, a contrary rule would allow the states to avoid federal firearms laws merely by applying a label to their laws, regardless of the procedures involved. There is no indication that Congress intended such a result.

20

.

## B.    ATF's Action Is Not In Excess Of Its Statutory Authority

Pursuant to 5 U.S.C. § 706(2)(C) a court may set aside agency action "in excess of statutory jurisdiction," and the State here claims that ATF's actions are in excess of its authority under the GCA. *See* Wy. Br. at 17-21. "In determining whether the agency acted within the scope of its authority, the court must determine whether, on the facts, the agency's decision can reasonably be said to be within the range of authority given to the agency by Congress." *Central States Const. v. Small Bus. Admin.*, 770 F. Supp. 1447, 1453 (D. Kan. 1991).

Subject to the direction of the Attorney General, ATF has been given very broad authority to "[i]nvestigate, administer, and enforce the laws related to . . . firearms." 28 C.F.R. § 0.130(a). *See also* 18 U.S.C. § 926(a) (authorizing "such rules and regulations as are necessary to carry out the provisions of this chapter"). The Tenth Circuit has therefore recognized that ATF has "been delegated authority to implement § 922(g)." *Atandi*, 376 F.3d at 1189; *Fraternal Order of Police v. United States*, 173 F.3d 898, 906 (D.C. Cir. 1999). Notably, the Supreme Court has stated that ATF has special knowledge and influence in the area of relief of legal disabilities under the GCA. *United States v. Bean*, 537 U.S. 71, 77 (2002). ATF's authority to implement and enforce the GCA extends to 18 U.S.C. § 922(g)(9), which prohibits those convicted of MCDVs from possessing firearms, and 18 U.S.C. § 922(t)(3), which allows state permits to qualify as NICS check alternatives only if the state does not grant such permits to persons who would be "in violation of law."

As such, it is well within ATF's "range of authority" to interpret who is included in this prohibited category of those subject to MCDVs under the GCA. It is within ATF's broad authority

21

to declare those States that qualify for the NICS alternative based on their recognition of these prohibited persons. As mentioned above, the GCA leaves several terms undefined. For a Court to find that ATF is outside its statutory jurisdiction in attempting to define these terms would severely hinder the ability to administer the federal laws that ATF – not the State of Wyoming – has been tasked by Congress with enforcing. *See United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (Whether agencies "enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretative choices").

C.    ATF's Interpretation of the Gun Control Act Is Entitled To Deference

Because the GCA is unambiguous, the Court should apply the federal standard set forth above, even if it is capable of other interpretation. *N.L.R.B. v. Oklahoma Fixture*, 332 F.3d 1284, 1286 (10th Cir. 2003). Even if ambiguous, the Court should defer to ATF's interpretation. Here, ATF's interpretation of the GCA is set forth in policy letters. *See Mead Corp.*, 533 U.S. at 229. Policy letters are not generally entitled to *Chevron* deference, but such policy letters with an agency's view of the law remain entitled to respect and due deference. *Id.* at 234. Deference is given based on the agency's specialized experience, its access to information, and the value in uniformity of national law. *Id.* The weight accorded to the agency turns on the thoroughness of its decision, the validity of its reasoning, consistency, relative expertness, and persuasiveness. *Id.* at 234-35.

Here, it is evident that ATF's letter is thorough in its consideration of the effect of the State statute under federal law and ATF carefully considered the State's contrary interpretation of the law. *Compare* AR at Exh. D, *with* AR at Exh. E. ATF determined that the term expungement in the GCA

22

demanded a uniform federal standard and that no indication existed that Congress intended the entirety of the Federal firearms laws to be contingent on whatever state procedure is labeled an "expungement" by the state without an examination of the state procedures. ATF's position has been consistent over the length of the dispute at issue. *See Mead Corp.*, 533 U.S. at 234. Further, because ATF drafted its policy letter long before litigation, its view is more than "just its litigating position." *McGraw*, 450 F.3d at 501. The relative expertness of the ATF is also of little question. *See United States v. Atandi*, 376 F.3d 1186, 1189 (10th Cir. 2004) (giving deference to an interpretative rule regarding aliens "illegally or unlawfully in the United States"). Due deference must be given to ATF's interpretation. *See id.*; *York v. Sec'y of Treasury*, 774 F.2d 417, 419-20 (10th Cir. 1985).

## III.    ATF'S ACTION DOES NOT OFFEND THE TENTH AMENDMENT

The Tenth Amendment protects the system of dual federal-state sovereignty. *Printz v. United States*, 521 U.S. 898, 918 (1997). The Tenth Amendment therefore (i) prohibits Congress from "commandeer[ing] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program," *Hodel v. Virginia Surface Mining & Reclam. Ass'n*, 452 U.S. 264, 288 (1981), and (ii) reserves to the states traditional police powers. The State argues that ATF's action violates the Tenth Amendment's by commandeering state functions. *See* Wy. Br. at 21-22.

This argument is meritless. It is clear that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." *Printz*, 521 U.S. at 932. ATF has not, however, compelled the State to take any particular course of action. ATF clearly offered the State a choice: its CCW permits may continue to serve as an alternative to a NICS check, but only if the

23

State provides an expungement within the meaning of Federal law to those with MCDV convictions, and if it declines to do so, the State may instead utilize the ordinary NICS system.

It is clear that offering the State a choice it dislikes is not commandeering. *Oklahoma v. United States*, 161 F.3d 1266, 1272 (10th Cir. 1998) (finding no Tenth Amendment violation where a federal statute "simply requires states to make a choice"). Indeed, the Tenth Amendment permits the federal government to encourage States to regulate in a particular way and even to give incentives to influence the State's policy decisions. *See New York v. United States*, 505 U.S. 144, 167-68 (1992). The choice here did just that: ATF encouraged the State to regulate firearms in a particular way and gave the State the incentive – the ability to use the NICS alternative system for its citizens – to influence that behavior. But requiring States to make such choices does not violate the Tenth Amendment. *See City of Abilene v. EPA*, 325 F.3d 657, 662 (5th Cir. 2003) (a "difficult, expensive or otherwise unappealing [choice] is insufficient to establish a Tenth Amendment violation").[10]

Notably, the State made a similar, and unsuccessful, Tenth Amendment challenge in *State of Wyoming v. United States Dep't of the Interior*, 360 F. Supp. 2d 1214 (D. Wy. 2005), *aff'd*, 442 F.3d 1262 (10th Cir. 2006). In that case, the State filed suit claiming that the Fish and Wildlife Service's actions violated the Tenth Amendment by commandeering "the legislative process of

---

[10] Furthermore, the fact CCW permits must be consistent with federal law to be used as a substitute for a federally-required background check also does not amount to coercion. The Supreme Court has rejected the assertion that the requirements of a federal program amount to Tenth Amendment violations. Indeed, "[a]ny federal regulation demands compliance" so that "a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity . . . presents no constitutional defect." *Reno v. Condon*, 528 U.S. 141, 150-51 (2000); *State of Oklahoma*, 161 F.3d at 1270.

24

Wyoming by demanding that Wyoming change its wolf management plan" to comply with federal law. *Id.* at 1238. This Court rejected these arguments and held that "any Tenth Amendment claim must establish that Congress has legislated outside its enumerated powers" and "Wyoming has simply failed to show how Congress has violated the State's reserved powers." *Id.* at 1240. Similarly, this Court rejected the notion that the State of Wyoming legislature is commandeered when faced with a choice to modify state law to participate in a federal regulatory program. *Id.* The State repeats that claim here and this Court should again reject this argument.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action or, in the alternative, rule that ATF's action neither violated the APA nor the Tenth Amendment.

Dated September 15, 2006                Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

MATTHEW H. MEAD
United States Attorney

CAROL A. STATKUS
Assistant United States Attorney

SANDRA M. SCHRAIBMAN (DC Bar 188599)
Assistant Branch Director
ALEXANDER K. HAAS (CA Bar 220932)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Br.
20 Massachusetts Ave., NW, Ste. 7328
Washington, DC 20530
Tel. 202-307-3937  Fax. 202-616-8470

25

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of September, 2006, I served a true and correct copy of

the foregoing **Response Brief of Defendants** upon the following, by the method(s) indicated below.

Patrick J. Crank
C. Levi Martin
Wyoming Attorney General
123 Capitol Building
Cheyenne, WY 82002
*Representing State of Wyoming*

[  ] By Facsimile
[✓] By U.S. Mail - postage prepaid
[  ] By Hand Delivery
[  ] By Overnight Courier
[  ] Electronic Filing

Alexander K. Haas
U.S. Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044
*Representing Federal Defendants*

[  ] By Facsimile
[✓] By U.S. Mail - postage prepaid
[  ] By Hand Delivery
[  ] By Overnight Courier
[  ] Electronic Filing

Larry B. Kehl
Buchhammer & Kehl
P.O. Box 568
Cheyenne, WY 82003-0568
*Representing National Rifle Assoc.*

[  ] By Facsimile
[✓] By U.S. Mail - postage prepaid
[  ] By Hand Delivery
[  ] By Overnight Courier
[  ] Electronic Filing

D. Stephen Melchior
2011 Central Avenue
Cheyenne, WY 82001
*Representing Gun Owners Foundation*

[  ] By Facsimile
[✓] By U.S. Mail - postage prepaid
[  ] By Hand Delivery
[  ] By Overnight Courier
[  ] Electronic Filing

_Melody Morse_
Office of the United States Attorney